**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **DOCKET NO. 1:21-cr-10064** |
| | ) | |
| **KOFI OSEI** | ) | |

**MR. OSEI'S SENTENCING MEMORANDUM**

Kofi Osei is an immigrant father and legal green card holder with no prior criminal history. He stands before this Court having accepted responsibility for his role within a much larger conspiracy where others, more involved and sophisticated than him, defrauded individuals of money. Given his role in the offense, his close relationship with his young son and daughter, and the devastating collateral immigration consequences awaiting him as a result of his conviction in this case,  a sentence of  time served, followed by five years of supervised release, and  a requirement that he pay full restitution is a sentence that is right and just in this case when all of the factors set forth in 18 U.S.C. §3553(a) are taken into account.

### I.        *Kofi Osei's History and Characteristics*

Mr. Osei was born and raised in a world of abject poverty. PSR ¶ 67. The slum in Accra, Ghana that Kofi called home, Nima-Maaobi, is one of the largest and poorest urban communities in Accra. With an extremely high population density, it is characterized by poor sanitation, poor access to safe water, dilapidated houses, open sewers, and poverty "so dire…the people cannot protect themselves from insults from the environment within which they live." *See* E. Aggrey-korsah and J. Oppong, "*Researching Urban Slum Health in Nima, a Slum in Accra,*" in *Spatial*

*Inequalities: Health, Poverty, and Place in Accra, Ghana*, vol. 110, no. May 2013, J. R. Weeks, A. G. Hill, and J. Stoler, Eds. 2013, pp. 109–124.[1]



*i Photos of the streets of Nima-Maaobi*

Within the Nima-Maaobi neighborhood, Kofi, his grandmother, mother, and three younger siblings lived together in a single 9 x 13 room. The room was situated within a larger building made of mud and concrete and topped with a roof of zinc metal sheets. Within it were fifteen additional rooms, shared by over thirty families. His family's room, rented for about $50.00 U.S. dollars a year – was a significant expense for his grandmother and mother, who supported the family by selling produce at a large outdoor market miles from their home.

---

[1]Available at:
https://www.researchgate.net/publication/299708823_Researching_Urban_Slum_Health_in_Nima_a_Slum_in_Accra

Life in the Nima-Maaobi slum was lived outside on the streets. Kofi's room (and the greater building at large), like most of the housing within the neighborhood, had no kitchen, bathroom, running water, or electricity. His family's cooking was done outside over an open fire on the sidewalk. The nearest toilet was blocks away - an outdoor public latrine shared by the neighborhood. By age seven, Kofi remembers walking a few miles each way to buy and carry home a gallon jug of clean water, which the family carefully rationed for cooking, drinking, or bathing.

Except during the rainy season, Kofi and his family slept on the floor. With no sewer or drainage systems, the streets would flood after heavy rains, seeping water mixed with trash and sewage into his building. With standing water flooding their room, Kofi and his family spent many sleepless nights trying to get an hour of rest balanced on top of plastic tables and chairs.

Kofi was used to going without. He walked to school, three miles each way, without shoes. He played soccer barefoot. He and his sibling each owned one school uniform and a few other items of hand-me-down clothing. Food was scarce. Although Kofi's grandmother worked long hours at the market to support her family, if sales were low, or the produce she bought to resell at the market spoiled, Kofi and his family didn't eat. On days when breakfast was the only meal, Kofi and his siblings would search for a generous friend or neighbor with extra food to share. When none were found, they took to the streets, hoping to scavenge and sell anything they could find to earn money to eat. PSR ¶ 67. When all else failed, to distract himself from hunger Kofi roamed the neighborhood, all the while navigating its many pitfalls of violence and crime. With no real infrastructure within the Nima-Maaobi slums, instances of domestic violence, gang-fights, vigilante justice, and violent crime were commonplace, and Kofi often witnessed

countless machete fights and gang-involved attacks, where beaten victims were left unmoving and bloodied, lying face down in the street. *Id.*

Unsurprisingly, Kofi fantasized that someday he and his family would escape their constant battle against the headwinds of poverty. As a diligent student, but an even better soccer player, Kofi dreamed that the sport he loved might be his opportunity out of Nima-Maaobi. Incredibly, this hope proved a reality. After playing soccer through school, Kofi joined a semi-professional league in Accra. Noticing his talent, a soccer recruiter approached Kofi and promised to take him on a six-month tour of the United States – in hopes of finding him an agent to pursue a sports career in the U.S. Although Kofi had an offer from a professional soccer league in Ghana - he jumped at the opportunity to travel to the States. When the recruiter backed out of the trip at the last minute, Kofi was faced with a dilemma – abandon his hope of starting a new life in the U.S., or stay in Ghana to play soccer professionally? Hanging onto his dream, Kofi, then almost eighteen, traveled to the U.S. alone, hoping to find a way to play the sport he loved in America, and lift himself, and his family, out of poverty. PSR ¶ 69.

Once in the U.S., Kofi played amateur soccer and attempted, unsuccessfully, to secure a position in a professional league. Although he had support from his uncle Remi in Boston, Kofi struggled to support himself financially and send money home to his family in Ghana. During this time, he married his then partner, Shivonne Taylor, and became a father after the birth of his son, Ibrahim. PSR ¶ 70, Although Mr. Osei and Ms. Taylor divorced in 2015, Kofi shares custody of Ibrahim, now nine-years-old, and is a dedicated and engaged father**.** PSR ¶ 72. In 2016, Mr. Osei's second child, his daughter Marilyn, was born. PSR ¶ 71. Although he and his daughter's mother, Portia Yeboah, did not stay together romantically, they remain close friends and co-parents, and Mr. Osei speaks to his daughter daily and visits her and Portia in Texas at

least once a year. PSR ¶ 72. Portia describes Kofi as an "excellent father" who "loves his

daughter immensely":

> "He video chats her every morning before school, and then calls her after school to see
> how her day was. He also has a son, from a previous relationship, and with both his son
> and Marilyn, Kofi shines as a dad. Although Marilyn and I live in Texas, we make sure
> that Kofi speaks to her every day, as do I. He helps me navigate all the stresses of being a
> parent and we make our decision together regarding Marilyn's care. He comes to Texas
> as often as he can to visit us, usually takes her to Boston for two weeks each year, and
> supports Marilyn financially whenever there is something she needs."

*See Support letters of friends and family*, *letter of Portia Yeboah at 4,* attached as Exhibit A.



Kofi loved being a father. But once his daughter was born, he began to feel the increasing

financial anxiety and responsibility of having to provide for two young children, while still

trying to earn enough to send money home to his family in Accra. Although he was aging out of

opportunities for a professional soccer career, he turned down job opportunities to play

professionally in Europe, as he did not want to leave his children or the life he was committed to building in U.S.  He became a legal permanent resident and green card holder in 2015, applied for citizenship in 2019, and dreamed of making enough money to bring his mother and siblings to the U.S. and provide for his family.

Kofi is now 30 years old. He has no other criminal history whatsoever. Although he has not been able to find work since the start of this case, he has spent his time continuing his education, taking and completing courses in information technology,[2] PSR ¶ 80, and spending time with his children. His uncle Remi Tetteh, in observing Kofi over the last two years, recalls:

> "One thing that has been incredibly striking to me is the bond between Kofi and his son, Ibrahim. It is beautiful. Kofi is a great dad who understands the importance of spending time with his kids - something he demonstrates week in and week out. Kofi takes his son to every soccer practice, and jiu jitsu class every weekend. Ibrahim follows his father everywhere and loves being with his dad. Kofi also always talks to his daughter Marilyn on a video call every day. Ibrahim and Marilyn are very close, despite the fact that they live apart, and they share a bond as close as siblings who live in the same house. Kofi works hard to make sure his son and daughter maintain this bond, as Kofi knows the importance of helping his kids foster this great relationship."

*See Support letters of friends and family*, *letter of Remi Tetteh at 1,* attached as Exhibit A.



---

[2] Specifically, he has obtained the Palo Alto – PCNSE IT certification and 2) NSE-4 Fortigate IT certification, documentation of which is attached at Exhibit B.

When not with his son or connecting with his daughter, Kofi is very active in his local soccer league. As a team mate, friend, and community member, he is described as "a devout friend and an amazing father to his kids", "some that is willing to sacrifice his time, money, and his resources to help the children" who participate in a local non-profit soccer club, United Africa, that he and a friend co-founded, and someone who is "always looking for ways to help his friends or his team mates". *See Exhibit A, Support Letters of Friends and Family*. All speak to the devastation they will feel when he is deported as an immigration consequence of this case and those closest to him express the genuine remorse he feels at the harm he has caused through his actions in this case. *Id.*

## II.     The Nature and Circumstances of the Crime

Mr. Osei has accepted responsibility for his role in the crimes before this Court. His involvement in these crimes came out of relationships and connections he had in his home country of Ghana and in neighboring Nigeria. He started by assisting people in Ghana with purchasing goods and cars, but then was recruited to provide American bank accounts for those engaged in fraudulent activities. Those types of schemes are, unfortunately, commonplace in West Africa. *See* Samson Ezea, "*Prevalence of Internet Fraud Among Nigerian Youths*," The Guardian (Jan. 28, 2017), available at https://guardian.ng/saturday-magazine/prevalence-of-internet-fraud-among-nigerian-youths/. Within Ghana, the prevalence of internet fraud, including "romance" type fraud, has become normalized among communities in Ghana, complete with its own culture, slang and terminology, and increasing presence and acceptance among Ghanian youth. *See* Alhassan, A. R. K., & Ridwan, A. (2021). *Identity expression—the case of 'Sakawa' Boys in Ghana*. Human Arenas, 1-22. doi:10.1007/s42087-021-00227, available at https://link.springer.com/article/10.1007/s42087-021-00227-w; BBC, "*Inside the world of*

*Ghana's internet fraudsters"* (May 10, 2015), available at https://www.bbc.com/news/world-africa-32583161; *see* Baylon, C. & Antwi-Boasiako, A. (2016). *Increasing internet connectivity while combatting cybercrime: Ghana as a case study*. Centre for International Governance Innovation Paper No. 44. Chatham House. Available at https://www.cigionline.org/static/documents/documents/GCIG%20no.44_0.pdf.

Internet fraud is so prevalent and has become so normalized among some West African communities in Nigeria and Ghana, that many college students participate in these schemes, using their intelligence and knowledge of computers to pull off these sophisticated schemes. It is a way to make money quickly, in countries with little economic opportunity. With the wealth they gain from participating in these schemes, these young men are often revered in their communities and become role models for younger people. It is so normalized that it is often referred to as a job and victims are referred to as clients. While this aspect of West African culture certainly does not excuse Mr. Osei's conduct, it does help put it into context.

Mr. Osei's role in these offenses was that of a money mule. He provided bank accounts for others who were committing much more sophisticated and "personal" crimes. He had no involvement in creating fake dating profiles and engaging in fraudulent relationships with individuals on dating sites, and he never engaged with any of the victims in this case or requested money from them. Instead, Mr. Osei's role was limited within the periphery of a much larger scheme. Of the money that was successfully obtained from these victims, Mr. Osei's "profit" stands in stark contrast to the amount of restitution, and amount of loss for purposes of the guidelines, applicable in this case, and should be considered a mitigating factor.

### III.    The Kinds of Sentences Available

A sentence must address the "kinds of sentences available." 18 U.S.C. §3553(a)(3). Prison is just one kind of sentence available in this case. There is no mandatory period of incarceration

required. Incarceration is just one tool the Court can use in fashioning a sentence here, and it is a tool that should be used as a last resort.[3] In 2016, a bipartisan Congressional task force wrote, "Incarceration is a highly punitive, costly, and potentially harmful intervention that should be used sparingly and judiciously." Charles Colson Task Force on Federal Corrections, *Transforming Prisons, Restoring Lives: Final Recommendations of the Charles Colson Task Force on Federal Corrections*, at 20 (January 2016), available at http://www.urban.org/research/publication/transforming-prisons-restoring-lives/view/full_report. Here, the Court has other less costly and less harmful options than incarceration, and Mr. Osei asks this Court to consider options such as home detention and supervised release here.

### IV.    The Sentencing Guidelines

In this case, there is no dispute that Mr. Osei has zero criminal history points, placing him in criminal history category I. PSR ¶ 62. However, we disagree with Probation's calculation of the guidelines, and object to the 2-level enhancement in the offense level under §2B1.1b(11)(A)(ii) for the "possession or use" of an "authentication feature". PSR ¶ 49.

As expressed in the defendant's original objections to the PSR, the defense objected to probation's original application of this enhancement under the theory that the fake passports Mr. Osei used to open bank accounts at issue triggered the enhancement. S*ee* Defendant's Objection to PSR, p.31. An 'authentication feature', under §2B1.1b(11)(A)(ii), and the corresponding 18

---

[3] As noted in every Pre-Sentence Report prepared in this district, a sentence of probation or supervised release also saves a tremendous amount of government funds, as incarceration costs approximately ten times the amount of money that supervision by a probation officer does. *See* PSR ¶101. This is yet another reason incarceration should be imposed as sparingly as possible.

U.S.C. §1028(d) definitions of the terms "authentication feature," [4] "identification document"[5] and "means of identification"[6] refer to *actual* (and not fictitious) individuals.[7] In the final PSR, probation agreed with the defense, stating "[t]he probation office erred in citing the passport as the controlling factor which triggers the enhancement and concurs with the defendant that the

---

[4]     An "authentication feature", as referred to in §2B1.1b(11)(A)(ii), is defined as "any hologram, watermark, certification, symbol, code, image, sequence of numbers or letters, or other feature that either individually or in combination with another feature is used by the issuing authority *of an identification document, document-making implement, or means of identification* to determine if the document is counterfeit, altered, or otherwise falsified;" U.S.C. § 1028(d)(1)(emphasis added).

[5]     An "identification document" is defined as "a document made or issued by or under the authority of the United States Government, a State, political subdivision of a State, a sponsoring entity of an event designated as a special event of national significance, a foreign government, political subdivision of a foreign government, an international governmental or an international quasi-governmental organization which, when completed with information concerning a particular individual, *is of a type intended or commonly accepted for the purpose of identification of individuals*." U.S.C. § 1028(d)(3)(emphasis added).

[6]     U.S.C. § 1028(d)(7) defines the term "means of identification" as "any name or number that may be used, alone or in conjunction with any other information, *to identify a specific individual*, including any—

> **(A)** name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number;
> **(B)** unique biometric data, such as fingerprint, voice print, retina or iris image, or other unique physical representation;
> **(C)** unique electronic identification number, address, or routing code; or
> **(D)** telecommunication identifying information or access device (as defined in section 1029(e))."

U.S.C. § 1028(d)(7)(emphasis added).

[7]  As the application notes of §2B1.1 makes clear, the term 'means of identification' under U.S.C. § 1028(d)(7) applies only to 'means of identification' of "actual (*i.e.* not fictious)" individuals. The §2B1.1 application notes do not contain a similar limiting definition for the term 'identification document' under U.S.C. § 1028(d)(3), because U.S.C. § 1028(d) already includes specific definitions for "identification document" (under U.S.C. § 1028(d)(3)) and "false identity document" (under U.S.C. § 1028(d)(4)), clearly indicating that one relates to real identity documents of actual people, while the other references fictious documents.

Inclusion of the term "identification document" (U.S.C. § 1028(d)(3)) but not "false identity document" (under U.S.C. § 1028(d)(4)) in §2B1.1b(11)(A)(ii)'s 'authentication feature' makes evident that only real identity documents of actual people trigger this specific enhancement.

fraudulent passports in this case do not qualify". *See* Probation Officer's Response to Objection #s 5 & 6 to PSR p.32. Probation then maintained the applicability of the §2B1.1b(11)(A)(ii) enhancement under the new theory that:

> "[T]he enhancement applies given that the defendant registered, through the Massachusetts Secretary of the Commonwealth's office, several businesses and then used those business certifications to open bank accounts. The Probation Office confirmed with the government that the business certifications bore the seal of the Massachusetts Secretary of the Commonwealth's office."

*See* Probation Officer's Response to Objection #s 5 & 6 to PSR p. 32**;** PSR ¶ 49. The defense objects to the application of §2B1.1b(11)(A)(ii) under this alternate application, as the enhancement does not apply to certificates of incorporations in company names. Under the definitions of "authentication feature," "identification document," and "means of identification" in 18 U.S.C. §1028(d), this application only relates to identification documents and means of identification of real *individuals*, not companies or businesses. Accordingly, without the two-level enhancement under §2B1.1b(11)(A)(ii), Mr. Osei's adjusted offense level is 32, and his total offense level is 29, which corresponds to a guideline range of 87-108 months of incarceration.

### V.      *Criticism of Fraud Guidelines Generally*

In this case, U.S.S.G. § 2 B1.1 provides for an 18-level increase to the offense level based on economic loss. It does not consider Mr. Osei's motivations for engaging in the scheme, or any of his individual characteristics. A sentencing process driven largely by a finding of loss, as in this case and in most fraud cases, ignores many important elements of Section 3553(a). See *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (noting that "the Sentencing Guidelines for white-collar crimes [can produce] a black stain on common sense"); *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y 2006), *aff'd 301* Fed. Appx. 93 (2d Cir. 2008)

(lamenting "the utter travesty of justice that sometimes results from the guidelines' fetish with absolute arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense).

Indeed, Courts have often recognized that the financial guideline is crude and frequently ill-fitting. As Judge Rakoff poignantly observed in *United States v. Gupta*, 904 F.Supp.2d 349, 350 (S.D.N.Y. 2012):

> The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.

Judge Rakoff observed in an earlier decision, "[a]s many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors." *Adelson,* 441 F.Supp.2d at 510, *citing generally* Kate Stith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998). In *Adelson,* Judge Rakoff ultimately imposed a sentence of three and one-half years, notwithstanding an advisory guideline range of life imprisonment. The Court called the Guidelines "wildly off-base," *id.* at 515, and called attention to "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings *if **not cabined by common sense.**" Id.* at 512 (emphasis added); *see also United States v. Musgrave,* 647 F. App'x 529, 538 (6th Cir. 2016) ("[T]here is reason to believe that, because the loss Guidelines were not developed using an

empirical approach based on data about past sentencing practices, it is particularly appropriate for variances.").

Judge Rakoff observed that the "vast increase in white collar sentencing was partly mandated by Congress, reacting in turn to public outcry over such massive frauds as Enron and WorldCom," and noted that "in implementing the Congressional mandate, the Sentencing Commission chose to focus largely on a single factor as the basis for enhanced punishment: the amount of monetary loss or gain occasioned by the offense." *Id*.

In a concurring opinion in *United States v. Corsey,* 723 F.3d 366, 379-80 (2d Cir. 2013), Judge Underhill echoed these same observations:

> The Sentencing Commission set the original 1987 Guidelines for economic offenses higher than historical sentences in order to further the deterrence and just punishment goals of sentencing. In 1989, in response to the savings and loan crisis, Congress passed legislation increasing the maximum penalties for financial fraud offenses and directing the Sentencing Commission to include specific offense characteristic enhancements in the fraud guideline … In 2001, the Sentencing Commission amended the Guidelines to combine the fraud, theft and embezzlement, and property destruction guidelines into a single guideline, section 2B 1.1. That change was accompanied by the publication of a new loss table that had the effect of increasing offense level calculations, especially for high-dollar value crimes… Most recently, the fraud guideline was amended in 2003 in response to Congressional directives in the Sarbanes-Oxley Act. Those amendments included further changes to the loss table that added offense level points in the highest loss cases. The three sets of amendments to the loss table of the fraud guideline alone have effectively multiplied several times the recommended sentence applicable in 1987 for large-loss frauds, which itself was set higher than historic sentences.

*Corsey,* at 379-80 (internal citations omitted). *See also United States v. Musgrave,* 647 F. App'x 529, 538 (6th Cir. 2016) ("[T]here is reason to believe that, because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, ***it is particularly appropriate for variances***.") (emphasis added).

Scholarship has also focused on the sentences for fraud offenses and whether judges are, in actuality, strictly following Guidelines calculations in such cases. A former staff attorney to

the U.S. Sentencing Commission engaged in a review of empirical data of federal sentences, observing that "[i]t appears that in practice, loss has very little correlation to the ultimate sentence imposed, regardless of how it determines the advisory guideline range." Mark H. Allenbaugh, *"Drawn from Nowhere: A Review of the US. Sentencing Commission's White Collar Sentencing Guidelines and Loss Data,"* 26 Fed. Sent'g Rep. 19, 23 (2013). Further, the author notes that "the data suggests that loss is an unsound measure of the seriousness of many offenses, with the result that judges are increasingly willing to go below the Guidelines when they impose sentences in white-collar cases." *Id.* at 19. Ultimately, the author concludes that "judges are rightly rejecting Guideline recommendations that are driven excessively by loss" and that "the fraud Guidelines themselves are in need of a thorough revision, which should start with a reconsideration of the definition and role of loss." *Id.* "[L]oss should fundamentally be reconfigured starting with what the Commission is most experienced with-empirical data." *Id.* at 26.

Sentencing Commission data also reflects what can only be described as broad judicial discomfort with guideline sentences in fraud cases. Sentencing Commission data for Fiscal Year 2021 shows that only 28.3% of sentences imposed in fraud cases in this district were within the guideline sentencing range.[8] U.S.S.C., *Statistical Information Packet, Fiscal Year 2021, District of Massachusetts,* at 16, available at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/ma21.pdf. Sentences

---

[8] Of this data, (three cases total) five percent were above the guideline range, and over 60 percent received a downward departure (excluding a downward departure pursuant to either §5K1.1 or §5K3.1). Available at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/ma21.pdf

imposed in fraud-type cases by courts in this district over the years echo these trends, and probation is a sentence other judges have imposed in the face of higher guidelines. *See, e.g., United States v. Aboagye-Marfo*, 14-CR-10050-GAO (guideline range 30-37 months, sentence of three years probation); *United States v. Ojoko*, 14-CR-10094 (guideline range 12-18 months, sentence of three years probation); *United States v. Isreb*, 14-CR-10063-GAO-1 (guidelines range 18-24 months, sentence of 4 years probation); *United States v. Douglas,* No. 10-CR-10420-GAO (sentence of probation after trial on theft of Social Security benefits, where GSR was 21-27 months); *United States v. Boamah*, No. 10-CR-40028-FDS (sentence of probation in mortgage fraud with $280,000 loss); *United States v. Millet*, No. 09-CR-10195-NG (government agreed to probation sentence were defendant stole $66,532 in Social Security benefits); *United States v. Bernard*, 10-CR-10307-JLT (sentence of probation in case where guideline sentencing range was 24 to 30 months and amount defendant embezzled from labor union was $175,312.30); *United States v. Prosperi*, No. 06-CR-10116-RGS,  *aff'd,* 686 F.3d 32 (1st Cir. 2012) (after trial, varying from 87-108 month guideline sentencing range and imposing sentence of three years of probation because loss amount did not fairly reflect defendant's culpability).

Thus, it is widely recognized that the offense level called for by the sentencing guidelines in these types of cases is, more often than not, a blunt proxy for measuring the appropriate punishment. "[W]hile there are times that quantity is an entirely appropriate proxy for culpability, at other times it is not … in many cases the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *United States v. Pimental*, 367 F.Supp.2d 143, 156 (D. Mass. 2005) (internal quotation and citation omitted).  For these reasons, in this case, the guidelines should be given less weight than in other cases in fashioning a just sentence. Rather than solely tethering Mr. Osei's sentence to the overall loss

amount here, he asks this Honorable Court to consider his individual characteristics, and to vary downward from this loss-driven guideline.

## VI.    *The Need to Avoid Unwanted Sentencing Disparities*

The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct is codified in 18 U.S.C. § 3553(a)(6). The U.S. Sentencing Commission provides limited data of dispositions for defendants whose primary guideline was U.S.S.G. § 2B1.1 and indicates that the average sentence was 66 months for defendants with Mr. Osei's total offense level and his Criminal History Category.[9] This data, however, excludes certain categories of defendants, including those cases where defendants were sentenced to time-served sentences, which potentially and significantly skews the results. As a result, it may be difficult for the Court to draw easy comparisons between those cases and this one. However, the data reflects that more than half of all offenders sentenced under Mr. Osei's GSR and the 2B1.1 Guideline in the last five years received a downward departure and/or downward variance. Thus, Mr. Osei's request for a below-guideline sentence in this case is supported by the statistics and data from the Sentencing Commission.

Generally, a non-jail sentence, even with the loss amount at issue in this case, finds support in other dispositions and judgments in this district. *See e.g., United States v. Pimental*, 367 F. Supp. 2d 143 (D. Mass. 2005) (defendant construction company owner in workers compensation fraud case sentenced to probation where loss figure $502,332.07); and *United States v. Schepps*, No. 11-CR-30016-MAP (D. Mass. Dec. 12, 2014), Sent. Transcript, D.E. # 56, pp. 4-5 (six-month sentence of imprisonment where restitution was $8,759,286 because defendant "primarily perpetrated this fraud for reasons other than selfishness").

---

[9]     *See* U.S. Sentencing Comm'n, Judiciary Sentencing Information data for Primary Guideline § 2B1.1 at cell I, 24, https://jsin.ussc.gov/analytics/saw.dll?Dashboard.

**VII.    *The Needs a Sentence Must Fulfill***

As in all sentencing proceedings, the Court's determination comes down to deciding what punishment is fair, necessary, and appropriate, given all of the relevant facts and circumstances. "Imposing a sentence on a fellow human being is a formidable responsibility," compelling "a court to consider, with great care and sensitivity, a large complex of facts and factors." *United States v. Gupta,* 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012). The Court must conduct a "more holistic inquiry" than simply plugging numbers into a guidelines calculation, and "section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overarching principle." *United States v. Yonathan Rodriguez,* 527 F.3d 221, 228 (1st Cir. 2008) (citing *Kimbrough v. United States*, 128 S.Ct. 558, 570 (2007)). That overarching principle is to "impose a sentence sufficient but not greater than necessary." *Id*. In reaching a decision on what constitutes an appropriate sentence, the district court should "consider all the relevant factors" and "construct a sentence that is *minimally sufficient* to achieve the broad goals of sentencing." *Id.* (emphasis added).

In addition to consideration of other §3553(a) factors, such as the nature and circumstances of the offense, Mr. Osei's history and characteristics, and the guideline sentencing range, all addressed above, the Court must fashion a sentence that satisfies the four needs a sentence must fulfill. Put simply, those needs are: punishment, deterrence, incapacitation, and rehabilitation. *See* 18 U.S.C. §3553(a)(2). For Mr. Osei, a sentence of time served, with five years of supervised release and restitution, fulfills those needs.

The first purpose of sentencing is to "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." Certainly this case is serious, and Mr. Osei acknowledges that real people were affected by the actions he and others took in this case. However, his punishment should be proportional to his role and the acts he committed

as part of this conspiracy, as well as the consequences that will befall him now that he has pled guilty and been convicted of the instant crimes here.

In considering whether further incarceration is necessary in this case in order to punish Mr. Osei for his crimes, this Court can and should consider the collateral immigration consequences now awaiting Mr. Osei. *See United States v. Hercules*, 947 F.3d 3, 9 (1st Cir. 2020)(explaining that outside the illegal-entry context, a court may consider a defendant's impending deportation as a factor under 18 U.S.C. §3553(a)).[10] Having pled guilty, Mr. Osei not only has a criminal record for the first time in his life, and is a convicted felon,[11] his convictions

---

[10]     *See Hercules*, 847 F.3d at 9 ("we now hold that a sentencing court has the discretion, in an appropriate case, to weigh the possibility of future deportation when mulling the section 3553(a) factors in an effort to fashion a condign sentence" (footnote omitted). The Court of Appeals upheld the sentencing court's decision not to impose a lower sentence in *Hercules*, but repeatedly emphasized that a sentencing court may consider deportation as part of its assessment of history and characteristics or future dangerousness in fashioning a reasonably sufficient sentence "[u]nder appropriate circumstances" or "on the right factual record" or in "the right case," or "in the right factual context." *Id.* at 9-10.

This is the quintessential appropriate case. Mr. Osei came to the United States over a decade ago, is a current legal permanent resident, has no prior criminal record or illegal-reentry offenses, and because of his decisions in this case, will suffer disastrous consequences for the rest of his life. Once in immigration custody, he will almost certainly be removed and will never be able to return legally to the United States for the rest of his life.

[11]     Generally speaking, the fact that Mr. Osei has been prosecuted for a felony offense in federal court, and will live with that felony conviction forever, serves to reflect the seriousness of the offense and promote respect for the law. A felony conviction changes one's status in this country forever. It comes with significant collateral consequences. Courts have recognized that the stigma of a felony conviction constitutes punishment in and of itself. *See United States v. Prosperi*, 686 F.3d 32, 48 (1st Cir. 2012) ("Sometimes [courts do not] fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed" ); *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment of the defendant"); *United States v. Smith,* 683 F.2d 1236, 1240 (9th Cir. 1982) ("The stigma of a felony conviction is permanent and pervasive."); *see also* Wayne A. Logan, "Informal Collateral Consequences," 88 Washington Law Review 1103 (2013)  ("Today, convict status serves as a perpetual badge of infamy, even serving to impugn reputation beyond the grave."). For Mr. Osei however, the typical stigma befalling someone convicted of felonies pales in comparison to the collateral immigration consequences he will endure, as he is not a U.S. citizen.

constitute "aggravated felonies" under the Immigration and Nationality Act (INA).[12] See INA §

101(a)(43), 8 USC § 1101(a)(43). As a non-citizen convicted of multiple 'aggravated' felonies,

Mr. Osei is now deportable. *See* 8 U.S.C. § 1227(a)(2)(A)(iii). In turn, deportable noncitizens

"shall, upon the order of the Attorney General, be removed" from the United States. *Id.* §

1227(a). Further, Mr. Osei's aggravated felony convictions render him ineligible for various

forms of relief from removal, he is subject to mandatory immigration detention and is ineligible

for a bond hearing, warrant cancelation, and is barred from making an asylum claim. *See id.* §

1229b(a)(3) (cancellation of removal); id. § 1231(b)(3)(B)(ii) (withholding of removal); id. §

1158(b)(2)(A)(ii), (B)(i) (asylum). For Mr. Osei, "removal is practically inevitable" under

contemporary law for noncitizens who commit removable offenses. *Padilla v. Kentucky*, 559

U.S. 356, 363-64 (2010). His application and hope of one day becoming a U.S. citizen is gone.[13]

And once deported, Mr. Osei is barred from returning to the United States for the rest of his

life.[14]

      As father of two young children who are U.S. citizens, the fact that Mr. Osei will never

be permitted to return to the U.S., for any reason, is particularly devastating. It's obvious

practical consequence, the life-long physical separation from his U.S. citizen children and family

in the United States, constitutes a level of punishment not contemplated within our criminal

---

[12]     Conviction for money laundering and monetary transactions from illegally derived funds are "aggravated felonies".  8 U.S.C. § 1101(a)(43)(D), INA § 101(a)(43)(D). Similarly, a conviction involving fraud or deceit is an "aggravated felony" if the loss to the victim or government exceeds $10,000.  8 U.S.C. § 1101(a)(43)(M), INA § 101(a)(43)(M).

[13]  An aggravated felony conviction on or after 11/29/90 is a permanent bar to establishing good moral character (a prerequisite for naturalization). Immigration Act of 1990 § 509(a).

[14] 8 U.S.C. § 1182(a)(9)(A).

justice system. It is a collateral consequence of Mr. Osei's criminal convictions that represents a

significantly harsher punishment than he would otherwise experience, were he a U.S. citizen.

In light of uniquely punishing nature of his impending immigration consequences, further

incarceration would be unduly punitive. In Mr. Osei's situation, additional incarceration would

instead exacerbate the already devastating effects his separation will have on his family. It would

delay his ability to provide much needed financial support to his children and push him deeper

into arrears with his child support. It goes without saying that his children will suffer too without

their father in their life. Numerous studies have shown the effect that incarceration has on

children. *See* Anne R. Traum "*Mass Incarceration at Sentencing*," 64 Hasting Law Journal 423,

433 (2013) ("Incarceration isolates parents from their children, removes financial and caregiving

support for the children, and imposes on the family the cost, time, and stress of maintaining a

relationship with an incarcerated parent.") "Associated sociological and criminological theories

point to three prominent ways in which the effects of parental imprisonment on the social capital

of children might be understood. These involve the strains of economic deprivation, the loss of

parental socialization through role modeling, support, and supervision, and the stigma and shame

of societal labeling." John Hagan and Ronit Dinovitzer, *"Collateral Consequences of*

*Imprisonment for Children, Communities, and Prisoners"*, Crime and Justice, vol. 26 (1999),

121-162, 123. "The financial difficulties and loss of a parent precipitate a range of emotional and

psychological problems that affect these children, including educational failures, aggression,

depression, and withdrawal*." Id*. at 137-138. Even government-sponsored studies have for many

years recognized the need for alternatives to incarceration that minimize the damage suffered by

children, reduce recidivism, and increase family preservation. Ross D. Parke & K. Alison

Clarke-Stewart, *Effects of Parental Incarceration on Young Children* (Dec. 2001)

(commissioned by U.S. Dept. of Health and Human Services as part of its From Prison to Home: The Effect of Incarceration on Children, Families and Communities project); Child Welfare League of America, Parents in Prison: Children in Crisis (1997). The Court can properly consider the effect Mr. Osei's incarceration would have on his son and daughter in fashioning a sentence. *See, e.g., United States v. Lehmann*, 513 F.3d 805 (8th Cir. 2008) (where defendant convicted of felon in possession and where guidelines 37-46 months, district court's granting of downward departure or variance to probation with 6 months in half-way house proper after *Gall*, because of devastating effect mother's imprisonment would have on defendant's 8-year old son who was already suffering from trauma of accidental death of his sister who found and discharged the firearm); *United States v. Chambers*, 885 F.Supp. 12, 14 (D.D.C. 1995) (defendant is single mother with two children ages 12 and 15, incarcerating defendant for 15 years would deprived children of sole parent "that children need supportive and loving parents to avoid the perils of life is without question . . . causing needless suffering of young, innocent children does not promote the ends of justice"); *United States v. Hammond*, 37 F.Supp.2d 204 (E.D.N.Y. 1999) ( "A sentence without a downward departure would contribute to the needless suffering of young, innocent children").

The life Mr. Osei worked so hard to build in this country has forever been destroyed with this conviction. His deportation and separation from his children will cause him emotional suffering without end. In short, Mr. Osei is now experiencing, and will continue to experience, punishment for his crimes in ways that go beyond the sentence this Court will impose, and that should be taken into account in determining what additional measure of punishment is appropriate here. Although Mr. Osei will face additional difficulties as he resettles in Ghana, any future struggles will pale in comparison to the loss he will have to endure, beginning a new life

in his home country without his son and daughter. The thought of enduring a life apart from his children is excruciatingly painful, and the heartbreak of this unavoidable separation is a form of punishment that will stay with Mr. Osei for the rest of his life.

As to deterrence, the recommended sentence would have an "adequate" deterrent effect on both the general public and Mr. Osei. Determining the sentence that would "adequate[ly]" deter criminal conduct is appropriate because over a decade's worth of research indicates that while certainty of being caught and punished produces a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id.*; see also Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").; Steven N. Durlauf & Daniel S. Nagin, *Imprisonment and Crime: Can Both be Reduced?*, 10 Criminology & Pub. Pol'y, 37 (2011)[15]; Raymond Pasternoster, *How Much Do We Really Know About Criminal Deterrence*, 100 J. Crim. L. & Criminology 765, 818 (2010); Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013).

In sum, empirical studies have shown that longer sentences have minimal or no benefit on whether potential offenders commit crimes. The National Academy of Sciences (NAS) concluded that there is insufficient evidence justifying policy choices on the assumption that harsher punishments yield measurable deterrent effects, and that all leading surveys of the deterrence research reach the same conclusion: that 'potential offenders may not accurately

---

[15]      Available at http://onlinelibrary.wiley.com/doi/10.1111/j.1745-9133.2010.00680.x/pdf.

perceive, and may vastly underestimate, those risks and punishments' associated with committing a crime.[16]

Indeed, as a first-time offender, it is in fact likely that Mr. Osei's arrest, prosecution, and conviction will be deterrence enough. For over two years, Mr. Osei has shown that his arrest and prosecution in this case have deterred him and that he has successfully abided by all court-ordered conditions, indicating that there is no need to incarcerate Mr. Osei out of concerns for public safety or to deter him from future criminal conduct. Data collected by the Sentencing Commission, demonstrates that offenders with zero criminal history points, like Mr. Osei, have a lower recidivism rate than offenders with even one criminal history point. Tracey Kyckelhahn & Trishia Cooper, U.S. Sentencing Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* at 6–9 (2017). Like many other first offenders, he should be given some benefit of the doubt that this criminal prosecution will be sufficient to deter him from future criminal behavior.[17] Finally, it cannot be ignored that Mr. Osei's impending experience of deportation and the unwanted collateral immigration consequences he will suffer are, in itself, a significant deterrent in and of itself. Mr. Osei recognizes that, but for his own incredibly flawed decision-making, he would not be facing the reality of deportation and a lifetime ban from the country in which his children reside and are citizens.

---

[16] Brennan Center for Justice, What Caused the Crime Decline? (26 Feb. 2015), available at: https://www.brennancenter.org/publication/what-caused-crime-decline

[17] Other Courts have recognized a first-time offender's low risk of recidivism as grounds for a below-guideline sentence. *See, e.g., United States v. Darway*, 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status); *United States v. Urbina*, 2009 WL 565485, *3 (E.D.Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (Gertner, J. (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders").

There is also no rehabilitative value[18] for a sentence any longer than that proposed. Indeed, Congress itself has "recognize[ed] that imprisonment is not an appropriate means of promoting correction and rehabilitation." See 18 U.S.C. § 3582(a). Mr. Osei has no serious mental illness or substance use disorder history that requires intervention or treatment, and as a "deportable alien," he would not be eligible for placement in a residential re-entry center. BOP Program Statement 7310.04 at 10. Moreover, given his 'deportable alien' status,[19] he would not be eligible to participate in many of the BOP's rehabilitative programming. Further, with the COVID-19 pandemic's ongoing impact on BOP programming - it is very likely that Mr. Osei would have little opportunity to avail himself of programs he would otherwise qualify for. Thus, this crucial sentence goal cannot be

---

[18]    Further, because of the ongoing COVID-19 pandemic concerns and the unpredictability of outbreaks, it remains unclear what programming would be available to Mr. Osei in prison. It is quite likely that visits and phone calls with his children and other family and friends could be restricted, if not suspended entirely, for unpredictable periods of time. What little freedom of movement an incarcerated person might have within the institution, is often restricted even further during outbreaks and lockdowns during the pandemic. Incarcerated people are often locked in a small cell for 23 hours a day. The restrictions that prisons have put in place to try to slow the spread of the virus make sense. But they also significantly tip the quality of incarceration away from rehabilitation and further towards punishment, blunting the effectiveness of incarceration as a sentencing tool.

These harsher conditions of confinement during the pandemic are a valid consideration in deciding whether to impose a below-guidelines sentence. As one court noted, "When we do punish, we do not act cruelly." *United States v. Scarpa*, 815 F.Supp.88 (E.D.N.Y. 1993) (pretrial defendant with AIDS facing murder charges released on bail because of the "unacceptably high risk of infection and death on a daily basis inside the MCC"); *see also United States v. McFarlane,* 438 F.Supp.3d 125, 127 (D.Mass. 2020) (Gorton, D.J.) (holding that two-week confinement in solitary quarantine in a higher security facility is equivalent to two months in a camp). During the COVID-19 pandemic, "sufficient but not greater than necessary" can take on new meaning. In the context of post-conviction compassionate release motions, for example, courts justified sentence reductions during the pandemic "[t]o avoid a sentence that *was* sufficient but no greater than necessary from becoming one immeasurably greater than necessary." *United States v. Park*, 2020 WL 1970603 at *5 (S.D.N.Y. Apr. 24, 2020) (emphasis added) (internal citation omitted). *Accord United States v. Mel*, 2020 WL 2041674 at *3 (D. Md. Apr. 28, 2020) (finding release appropriate where "the actual severity of the sentence as a result of the COVID-19 outbreak exceeds what the Court anticipated at the time of sentencing.").

[19]    *See* Alan Ellis and Todd Bussert, "Residential Drug Abuse Treatment Program (RDAP)," *Criminal Justice*, Vol. 30, No. 4, 30-33 (Winter 2016) at 30 available at https://alanellis.com/wp-content/uploads/2016/08/aba-rdap.pdf.

adequately fulfilled by any additional sentence of imprisonment in this case.

Although a period of incarceration would certainly exist to incapacitate him further, the costs cannot be justified. Instead, additional carceral time would prolong his separation from his family, diminish his potential earning capacity, isolate him from developing pro-social connections in the community, delay his productive contribution to society, and risk exacerbating his physical and mental health. It would offer no additional deterrent or rehabilitative value, stymie meaningful retribution, and subvert the additional sentencing goals of 18 U.S.C. § 3553(a)(2). For these reasons, the defendant asks this Court to impose the requested sentence.

<u>Conclusion</u>

This Court should "consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Kofi Osei is a dedicated and loving father with no prior criminal history who made the poor and misguided decision to commit the crimes before this Court. He has come to realize the seriousness of those crimes, has accepted responsibility for his actions, and will experience the collateral consequences of his convictions for the rest of his life. As such, the requested sentence is a just sentence for Mr. Osei.

Respectfully submitted,
Mr. KOFI OSEI,
By his attorney,

*/s/ Forest O'Neill-Greenberg*
Forest O'Neill-Greenberg
BBO # 674760
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
Tel: 617-223-8061

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 14, 2023.


                                         */s/Forest O'Neill-Greenberg*
                                         Forest O'Neill-Greenberg